**In re George Peter REITZ, Karen Kaye Reitz, Debtors.**

**Bankruptcy No. 87–20244–12.**

United States Bankruptcy Court, D. Kansas.

Nov. 19, 1987.

Steven R. Wiechman, Topeka, Kan., Stanley R. McAfee, Kansas City, Kan., for debtors.

Julie A. Robinson, Asst. U.S. Atty., Kansas City, Kan., for U.S.

Eric C. Rajala, Overland Park, Kan., Standing Chapter 12 Trustee.

### MEMORANDUM OPINION AND ORDER

BENJAMIN E. FRANKLIN, Chief Judge.

On August 12 & 14, 1987, this matter came for hearing on the confirmation of the debtors', George Peter Reitz and Karen Kaye Reitz, chapter 12 plan, and on the objection of the United States to such confirmation. The debtors appeared in person and by counsel, Steven R. Wiechman and Stanley R. McAfee. The United States, acting through its agency, Farmers Home Administration (FmHA), appeared by counsel, Julie A. Robinson, Assistant United States Attorney. The standing trustee, Eric Rajala, appeared in person.

### FINDINGS OF FACT

Based upon the testimony, the exhibits, and the record, this Court finds as follows:

1. The debtors, George Peter Reitz and Karen Kaye Reitz, filed a petition for relief under chapter 12 of Title 11, United States Code on February 24, 1987.

2. The debtors are dryland farmers in Leavenworth County, Kansas.

3. The debtors' farm consists of two parcels of land.

4. The first parcel is described as "a tract of land in the South ½ (one-half) of Section 24, Township 12, Range 22, Leavenworth County, Kansas." This property consists of 45 acres of unimproved agricultural land with approximately 60% of the acres tillable.

5. The second parcel is described as "a tract of land in the Northwest ¼ of Section 8, Township 9, Range 21, a tract in the South ½ of Section 8, Township 9, Range 21 and a tract of land Northeast of Section 17, Township 9, Range 21 all containing 525 acres M/L." This property consists of 525 acres of agricultural land with approximately 50% of the tillable acres. The remainder is timber or waste ground.

6. The 525 acres has had a history of continual flooding since 1980 due to special structural considerations on and around the property. Both the Walnut and Stranger Creek flow into this farm area. To the south of the property is a structure referred to as the "Thiel Dike." To the west of the property is a structure referred to as the "Swinn's Dike." To the north is a structure referred to as the "Domann Dike." The presence of these dikes has apparently caused delay in free water flow resulting in flooding on the debtors' property during the fall and spring. Since 1980, the debtors have spent $21,000 in attorney's fees and another $4,000 in other measures to attempt to solve the flooding problem.

7. The United States, acting through the Small Business Administration (SBA), has filed a secured claim asserting a first lien on the 45–acre parcel in the amount of $38,904.47.

8. The United States, acting through the Farmers Home Administration (FmHA), has filed a secured claim asserting a first lien on the 525–acre parcel in the amount of $226,512.14.

9. On July 1, 1987, the debtors filed their chapter 12 plan to adjust the debts of a family farmer with regular annual income. Under their plan and based upon an appraisal, the debtors valued the 43–acre tract at $30,000 and the 525–acre tract at $130,000. The plan provided for payment to SBA of $30,000 over 30 years with interest of 3.5% per annum; and for payment to FmHA of $130,000 over 30 years with interest at 8.5% per annum.

10. Under this plan, the debtors projected the following income:

|  | 1987 | 1988 | 1989 |
|---|---|---|---|
| Corn Production | 20,800.00 | 20,800.00 | 20,800.00 |
| Soybean Production | 9,200.00 | 11,025.00 | 11,025.00 |
| Wheat Production |  | 2,200.00 | 2,200.00 |
| Truck Farm Production | 3,000.00 | 8,000.00 | 10,000.00 |
| ASCS Support Payments | 6,700.00 | 11,000.00 | 11,000.00 |
| ASCS Support Received | 4,944.84 |  |  |
| Other Income | 250.00 |  |  |
| Woodcutting | 1,500.00 | 2,000.00 | 1,500.00 |
| TOTAL | $46,394.84 | $55,025.00 | $56,525.00 |

The anticipated corn production is based on 144.5 acres times 77 bushels per acre (county average yield) times $1.87 per bushel (county support price). The bean production is based upon 50 acres times 36 bushels per acre (county average yield) times $5.25 per bushel (county support price). The "Truck Farm Production" includes producing tomatoes, watermelons, and okra. The amount of truck farm income increases each year because the debtors intend to increase the acreage planted for truck farming each year.

11. All the projected income is contingent upon first correcting the flooding problem. The debtors intend to do this by constructing a dike of their own. The debtors anticipate the cost of construction is $2,500 to $3,500 depending on soil condition.

12. Under this plan, the debtors projected the following expenses: 1987—$46,205; 1988—$55,070; 1989—$56,795; 1990—$56,880; and 1991—$55,719.

13. On August 5, 1987, the United States, acting through both agencies, SBA and FmHA, filed objections to confirmation of the plan. SBA objected on the grounds that the plan fails to pay the SBA the value of its security as required by § 1222(b)(9) and 1225(a)(5). SBA valued the 45 acres at $33,000 rather than the debtors' estimated

value of $30,000. FmHA also objected to confirmation on the ground that the plan fails to pay FmHA the value of its security. FmHA valued the 525–acre tract at $223,125 rather than the debtors' estimated value of $130,000. Furthermore, both SBA and FmHA objected on the grounds that the plan is not feasible.

14. On August 12 & 14, 1987, this matter came for hearing on the confirmation of the debtors' plan and on the United States' objection.

15. At the hearing, the SBA acceded to the debtors' valuation of the 45–acre parcel at $30,000. As such, the issues narrowed to primarily the following questions: (1) What is the value of the 525–acre parcel which the FmHA holds as security; and (2) Whether or not the plan is feasible.

16. As to the valuation issue, the debtors called John Gurss from Easton of Leavenworth County, Kansas as their appraiser. Gurss has been an agricultural real estate appraiser for 30 years. The majority of his appraisals were in Leavenworth County. Gurss appraised the fair market value of the 525 acres, of which he estimated 280 acres were tillable and the remainder was timber, at $130,000. Gurss arrived at the figure by first, viewing the land, and second, by using the "comparable market approach," which compares sales of similar property in the area. More specifically, Gurss used the following comparables:

COMPARABLE # 1, is a tract of land in the Northwest ¼ of Section 33, Township 8, Range 21 and the Southwest ¼ of Section 28, Township 8, Range 21, consisting of 320 acres M/L. Property is located four miles from subject, 60% tillable and is not in the flood plain area. Property is improved with three large silos, a small dwelling and an older barn. Sold in June 86 for $104,000 or $325 per acre.

COMPARABLE # 2, is a tract of land in the Southwest ¼ of Section 7, Township 8, Range 21, consisting of 160 acres M/L. Sold in December 1985 for $62,000 or $387 per acre. Property is located six miles from subject and is unimproved with approximately 50% tillable, with

only a small portion being in the flood plain area.

Gurss further testified that in analyzing these comparables, he took into account the fact that the subject property has a long history of flooding.

17. FmHA called Bart Waring from Platt City, Nebraska as their appraiser. Waring owns his own real estate appraisal service. However, his expertise in appraising farm land, and especially farm land in Leavenworth County, was lacking somewhat. Furthermore, cross-examination by the debtor revealed that Waring did not personally survey the land. Waring used an "employee" to actually view the land. At first, Waring appraised the fair market value of the 325 acres, of which he estimated 300 acres were tillable and 50 acres were available as "pasture," at $288,000. However, at the hearing he reduced his appraisal to $229,000 because of his apparent over-estimate in the amount of tillable acres. Waring testified that he arrived at the $229,000 figure by also using the comparable market approach. Waring used the following comparables:

The subject property contains approximately 525 acres with an estimated 300 acres in tillable cropland (corn). 80 acres in pasture or grass, and 145 acres in timber and waste area. The cropland is in the level area west and south of the heavily treed and hilly area which involves most of the central and northwest section of the tract. (sold for $116,000).

SALE A—160 acre tract with 123 acres in crops. 30 acres in pasture and 7 acres in waste. It is terrace with waterways and is well fenced. It has a shed valued at $1000, small pond, and is Class III & IV soils, rolling, located on old 59 Highway (provided by FMHA). (sold for $116,000).

SALE B—160 acre tract with 139 acres in crops and 21 acres in waste Class III & IV soils rolling, located on old 59 Highway (provided by FMHA) (sold for $105,000).

SALE C—160 acres with an est. 120 acres in pasture and 40 acres in timber. There is a house, 2 sheds, garage and

barn valued at $30,000. Provided by Harker Realty. (sold for $96,000).

18. FmHA also called Dean Altenhofen, the Leavenworth County supervisor for the FmHA. Altenhofen valued the property at $223,125 based upon his estimate of 266 tillable acres and 80 acres of pasture land.

19. As to the feasibility issue, the debtors called debtor, George Peter Reitz. Reitz testified about his flooding problems and about his plan to build a dike. Reitz testified that, in order to build a dike, he must first receive approval from the Kansas Water Resources Board. Reitz also testified about his projected income and expenses.

20. On cross-examination by the FmHA, Reitz testified that he had not kept records concerning his farming, and as such, he could not testify with any certainty as to how much he produced from 1980 to 1986. He testified that the best he could remember his yields on the 525 acres were as follows: 1980—none because of a drought; 1981—none because of a flood; 1982—none because of a flood; 1983—none because of a flood and drought; 1984—some production; 1985—some production; 1986—very little production because of flooding.

## CONCLUSIONS OF LAW

FmHA's objections to confirmation of the debtors' chapter 12 plan raises two issues: (1) Does the plan pay FmHA the value of its security as required by section 1222(b)(9) and 1225(a)(5); and (2) is the plan feasible as required by section 1225(a)(6)? After reviewing the plan and all the evidence presented at the confirmation hearing, this Court must find that the answer is *no* to both questions.

A. *Valuation of the Land under §§ 1222(b)(9) & 1225(a)(5).*

■ Section 1222(b)(9) provides that a plan may "provide for payment of allowed secured claims consistent with section 1225(a)(5) of this title." Section 1225(a)(5) provides that this Court shall confirm a plan if, with respect to each allowed secured claim provided for by the plan, "the plan provides that the holder of such claim

retain the lien securing such claim;" and *"the value,* as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim (*emphasis added.*)" In other words, the chapter 12 plan must provide that the secured claimant, FmHA, retain its lien on the 525–acre tract and receive the equivalent value of the 525–acre tract. *See* 5 Collier on Bankruptcy ¶ 1225.02 (15th ed. 1987).

In the present case, the debtors estimate the value of the 525–acre tract at $130,000. The debtors arrived at the $130,000 figure by using the appraisal of their expert, John Gurss. Gurss has a tremendous amount of farmland appraisal experience in the Leavenworth area. However, this Court cannot agree with the figure arrived at by Gurss. Gurss considerably underestimated the value of the 525–acre tract. Gurss' appraisal was based on two comparables. The first comparable is pasture land for the most part and is not good fertile bottomland like the Reitz' land. The second comparable does not contain tillable bottomland at all like the Reitz' land. Furthermore, Gurss testified that he took into account the fact that the Reitz land has a very long history of flooding. As such, the appraisal was based on the property "as is"," and not as it supposedly will be with a dike as proposed by the debtors. Certainly, the value of the land is greater than $130,000 if the debtors can control the flooding with a dike.

The FmHA, on the other hand, submitted an appraisal by its expert, Bart Waring, which valued the 525–acre tract substantially higher than the $130,000 valuation. Waring appraised the land at $229,000 based on the sale of three somewhat comparable tracts in the area. Waring used three comparables with approximately the same percentage of tillable acres as the Reitz' property.

However, this Court cannot accept the valuation figure submitted by FmHA. Although the comparables were better than the ones used in debtors' appraisal, the FmHA appraisal was weak in other areas.

Waring lacked farmland appraisal experience in the Leavenworth area. Furthermore, Waring has never personally viewed the land he appraised. He testified that he used an "employee" to actually walk the land.

Since this Court finds that both appraisals were weak, one on the low side and one on the high side, this Court must arrive at its own valuation figure. I see no other way to do it than merely to split the difference. As such, I find that the property should be valued at $174,500.

In any event, the $174,500 figure is still substantially above the $130,000 figure listed in the plan. Therefore, the plan cannot be confirmed because it does not provide that the FmHA receive the equivalent value of the 525–acre tract as required by sections 1222(b)(9) and 1225(a)(5).

B. *Feasibility of the Plan under Section 1225(a)(6).*

Section 1225(a)(6) provides that the Court shall confirm a plan if "the debtor will be able to make all payments under the plan and to comply with the plan." This section is referred to as the feasibility section. It is for the Court to decide whether the chapter 12 debtors can make all payments and still fulfill the obligation to support their dependents. *See* 5 Collier on Bankruptcy ¶ 1225.04 (15th ed. 1987).

After reviewing the debtors' projected income and expenses and reviewing the testimony of the witness, this Court finds that the debtors cannot make all payments and still fulfill the obligation to support their dependents.

First, this Court cannot confirm a plan based on "visionary schemes" like the one proposed here. The Honorable Harold Lavien, Bankruptcy Judge for the District of Massachusetts, summed it up well when he wrote that "[b]ankruptcy is perceived as a haven for wistfulness and the optimists valhalla where the atmosphere is conducive to fantasy and miraculous dreams of the phoenix rising from the ruins. Unfortunately, this Court is not held during the full moon, and while the rays of sunshine sometimes bring the warming rays of the sun,

they more often also bring the bright light that makes transparent and evaporates the elaborate financial fantasies constructed of nothing more than the gossamer wings and of sophisticated tax legerdemain." *In re Maxim Industries, Inc.,* 22 B.R. 611 (Bankr.D.Mass.1982).

All of the debtors projected income estimates are based on the visionary scheme of building a dike. Mr. Reitz testified that he had not kept records but that as best as he could remember his yields on the 525–acre tract were as follows: 1980—none because of a drought; 1981—none because of a flood; 1982—none because of a flood; 1983 —none because of a flood and drought; 1984—some production; 1985—some production; 1986—very little production because of flooding. The debtor further testified that he had spent, since 1980, $21,000 in attorney's fees and another $4,000 in other measures to attempt to solve the flooding problem but had failed. Now all of a sudden he is in bankruptcy and he is very optimistic that he can stop the flooding merely by spending $3,500 to construct a dike. However, the debtors cannot say with any certainty that the dike will be approved by the state, and if so, how long it will take before it is operable. This Court finds it cannot confirm a plan based on the debtor's optimism alone.

Second, even if the Court did agree with the debtors and accept their figures in the income and expense statement as true, it could not confirm this plan, due to the fact that they will be running a budget deficit from the start because of this Court's finding on the first issue of valuation. I found that the debtors must pay more than the projected $130,000 to the FmHA. That finding alone makes the debtors' plan unfeasible on its face.

IT IS THEREFORE, BY THE COURT, ORDERED That the confirmation of the debtors' chapter 12 plan is DENIED and that the United States' objection is SUSTAINED.